IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

January 8, 2019 Session

## STATE OF TENNESSEE v. STERLING PANCHIKAL

**Appeal from the Criminal Court for Shelby County**
No. 17-02115    Chris Craft, Judge

_____

### No. W2018-00826-CCA-R3-CD

_____

The Defendant, Sterling Panchikal, caused a traffic accident which resulted in one death and several injuries. She entered guilty pleas to reckless homicide, three counts of reckless endangerment, and possession of marijuana. The Defendant sought but was denied judicial diversion for her offenses, and she was sentenced to six years of probation, with thirty days to be served incarcerated. On appeal, she argues that the trial court was mistaken about the nature of one of the offenses to which she was pleading guilty and that the trial court erred in denying diversion. Because the record reflects that the trial court believed that the Defendant was pleading guilty to vehicular homicide as a result of reckless conduct rather than reckless homicide, we vacate the judgments and the denial of diversion, and we remand the case to the trial court for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Vacated; Case Remanded**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

Jason D. Ballenger (on appeal), Memphis, Tennessee, and Juni Ganguli and Laurie Hall (at trial), Memphis, Tennessee, for the Appellant, Sterling Panchikal.

Herbert H. Slatery III, Attorney General and Reporter; Robert W. Wilson, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Abby Wallace, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**FACTUAL AND PROCEDURAL HISTORY**

The accident at issue took place on the morning of the Defendant's seventeenth birthday, after she had consumed intoxicants on the previous night. The facts were introduced during a hearing which served both as a guilty plea hearing and a sentencing hearing. During the plea portion of the hearing, the prosecutor summarized the circumstances of the offense by stating that the Defendant had veered off the roadway, crossed the median, smashed through a cable barrier, and struck an oncoming vehicle head-on, resulting in the death of Ms. Alejandra Sanchez Ponce. Ms. Sanchez Ponce's daughter, Ms. Araceli Rubio Sanchez, was airlifted from the scene with critical injuries. The Defendant's vehicle also struck a second car, resulting in non-life-threatening injuries to its three occupants, Ms. Mayra Herrera Monteil and two children. A third oncoming vehicle was struck with debris from the accident.

The prosecutor noted that law enforcement found a pink bag in the Defendant's vehicle and that inside the bag was marijuana, a marijuana grinder, a glass pipe, electronic scales, and a pill bottle. Also located in the vehicle were two bottles of vodka. One of the bottles was broken, and the other had been opened and was partially empty. A toxicology report showed the presence of a small amount of marijuana in the Defendant's system at the time. Her blood also tested positive for citalopram and alprazolam[1] but was negative for the presence of alcohol.

The Defendant stood indicted for the reckless vehicular homicide of Ms. Sanchez Ponce, the aggravated assault with a deadly weapon of Ms. Rubio Sanchez, the aggravated assault by means of serious bodily injury of Ms. Rubio Sanchez, the aggravated assault with a deadly weapon of Ms. Herrera Monteil, one count of reckless endangerment of the two children in Ms. Herrera Monteil's car, and possession of a controlled substance. As part of the guilty plea, the Defendant agreed to an amendment of the indictment. Accordingly, the charge of vehicular homicide was amended to the offense of reckless homicide; the two charges of aggravated assault with a deadly weapon were amended to charges of reckless endangerment with a deadly weapon, and the count charging the aggravated assault of Ms. Rubio Sanchez by means of serious bodily injury was dismissed.

---

[1] Although the State did not introduce proof regarding the substances in the Defendant's blood, the Defendant on cross-examination was asked about the origin of the Xanax that "was in [her] system," and responded that she was given the Xanax by a friend.

- 2 -

In ascertaining whether the Defendant's guilty plea was knowing and voluntary, the trial court noted that if she were convicted of "reckless vehicular homicide," she would face a sentence of between three and fifteen years in prison, and that this sentence would be three to six years if she were a Range I offender. The trial court did not address the range of punishment for reckless homicide. The trial court also recited the potential range of punishment for her charges of aggravated assault, a Class D felony. The court inquired into whether the Defendant agreed to an amendment of the indictment from counts charging aggravated assault to counts charging reckless endangerment with a deadly weapon, a Class E felony. The court noted that the aggravated assault had a potential punishment of two to twelve years, whereas the reckless endangerment had a potential punishment of one to six years.

The trial court accepted the Defendant's guilty pleas, and the State introduced evidence related to sentencing. Mr. Russell Duvall, a crash investigator with the Shelby County Sheriff's Office, testified that when he arrived on the scene, the Defendant and all of the victims except for Ms. Sanchez Ponce had been transported to the hospital. Witnesses told Mr. Duvall that the Lexus driven by the Defendant veered off the roadway, crossed the median, proceeded through the cable barrier, struck Ms. Sanchez Ponce's vehicle, and then struck Ms. Herrera Monteil's vehicle. Mr. Duvall retrieved data from the "black box" in the airbag control module on the Defendant's vehicle. The data revealed that, five seconds before the crash, the Defendant was traveling two miles per hour over the speed limit. The Defendant never engaged the brake during the five seconds it took her to cross the median and break through the cable barrier, although the car slowed down somewhat as it travelled on the grass and through the barrier. At the time of impact, the vehicle was travelling at forty-seven miles per hour. There were no skid marks or "erratic movements."

Mr. Duvall testified that he attempted to inventory the Defendant's vehicle and to locate her driver's license. He found an unopened, broken bottle of vodka and a partially consumed bottle of vodka on the passenger's side floorboard. Next to the bottles of vodka was the Defendant's purse, which contained marijuana, electronic scales, a marijuana grinder, and a pipe used for smoking marijuana.

The Defendant's cell phone was searched pursuant to a search warrant. The cell phone contained pictures of the bottle of vodka, the marijuana, the grinder, and the pipe on a hotel bed. A photograph of the phone displaying recent messages sent by the Defendant was introduced into evidence. The Defendant had sent a text message that read, "[W]e literally just sat down on the grass and started smoking a blunt." In response to a text observing that the night sounded fun, she stated, "It was bahaha." She then wrote that she had spent time with the friend who had gotten her the two bottles of vodka

for her birthday. She stated, "I got barred out and stoned af." The cell phone also contained a text message which was partially typed out but never sent.

Mr. Duvall testified that the Defendant tested positive for marijuana but that the results were "more than likely" residual due to the low level of the substance in her blood. He testified that the toxicology results led him to believe that the accident was not caused by intoxication but by recklessness.

Ms. Rubio Sanchez testified that she and her mother were driving home from work on the day of the accident. Ms. Rubio Sanchez suffered a broken arm and bruising to her head which required a three-day hospital stay and a year of subsequent medical care. Ms. Rubio Sanchez testified that Ms. Sanchez Ponce had thirteen children ranging in age from thirty-two to seven and that she had been a hard worker who was always ready to do a favor for anyone.

The Defendant's father testified regarding the Defendant's childhood and mental health. The Defendant's father and mother divorced when the Defendant was eight years old due to the Defendant's mother's mental health issues, which included bipolar disorder and schizophrenia. The Defendant's father testified that the Defendant's mother was abusive to the children and that, due to his work hours, he was not aware of everything happening in their home. He elaborated that the Defendant's mother began using drugs, took the children to get drugs, and then threatened or spanked them to ensure their secrecy. On one occasion, the Defendant's mother threatened the family with a knife, and the Defendant's maternal grandmother called the police. On another occasion, the Defendant's mother passed out in the carpool line at school. The Defendant's father testified that he was an immigrant and had a difficult time raising the children by himself.

When the Defendant was fifteen or sixteen years old, she began to rebel and asked to spend time with her mother, bringing her younger sister along. The Defendant's younger sister eventually showed the Defendant's father a video of the Defendant and her friends drinking alcohol and smoking marijuana with the Defendant's mother. The Defendant ran away from home, and after she was located, she was admitted to Lakeside, a behavioral health facility. The Defendant's mother exercised sporadic visitation and had not attended the Defendant's court dates.

The Defendant's father testified that he spoke to her in the hospital soon after the accident and that she told him that she had not been drinking. The next morning, the Defendant called him, hysterical because she did not know where she was or what had happened. The Defendant has had no memory of the accident since that time. When the Defendant was told that someone died in the accident, she wanted to kill herself and was

put on medication and suicide watch. The Defendant's father testified that the Defendant is remorseful.

The Defendant was placed into Memphis Recovery Center ("MRC") for five months for inpatient treatment after the accident. She returned to school and graduated on time by taking extra classes. She was enrolled in college and active in church. The Defendant's father testified that she was diagnosed with bipolar disorder and was taking medication and that she suffered from anxiety. He stated that "all of the sorrys in the world … won't bring back the victim" but asked for clemency.

The Defendant also testified at sentencing. The accident took place on the Defendant's seventeenth birthday, May 2, 2015. She testified that she could not recall anything from the day of the accident but that she recalled going to the Beale Street Music Festival and to a hotel with friends the night before. The Defendant received the alcohol and marijuana as presents for her birthday.

The Defendant confirmed that she attempted to harm herself after the accident because she "didn't know how [she] could fix it." She also suffered injuries including a fractured hip, ribs, shoulder, and pelvis. She confirmed that she used drugs with her mother, although she noted that she did not like alcohol and her mother was the one drinking. She was diagnosed with bipolar disorder at Lakeside the year before the accident. After the accident, she went to Parkwood Behavioral Center and subsequently to MRC. She testified that she was currently in counseling and currently taking medication. She stated that she attended Alcoholics Anonymous or Narcotics Anonymous meetings "[s]poradically." The Defendant testified that she was not using drugs or alcohol and that she was in school. She wanted to work with children and currently had a job as a barista. She apologized to the victim's family and said she wished she could take the victim's place.

The Defendant acknowledged that the marijuana pipe and grinder belonged to her. She also acknowledged that she used marijuana and was intoxicated the night before the accident. She testified that the Xanax in her system came from the friend who had given her the alcohol. She acknowledged she did not regularly wear a seatbelt and that her seatbelt was not fastened at the time.

In assessing whether to grant judicial diversion, the trial court examined the Defendant's amenability to correction. It noted that she seemed compliant and remorseful at the hearing. However, the trial court expressed certain concerns based on information in the presentence report. The presentence report reflects that the Defendant acknowledged only marijuana use and that she "adamantly denied use of Xanax and alcohol," asserting that "she only used Xanax once on the night of this offense." When

MRC was contacted for the report, the Defendant's counselor stated that while the Defendant at first denied using substances other than marijuana, "as treatment progressed she admitted to use of alcohol and 'pill use' (which is usually benzodiazepines according to [the counselor]) and Xanax." The trial court found that while the Defendant denied the use of Xanax when interviewed for the presentence report "she had already admitted to Xanax when she was at [MRC] at the age of 15, well apparently." The trial court also highlighted that, according to the presentence report, the Defendant had "reported she is not taking medication as she wants to feel happy on her own." The court also found that the Strong R Report indicated that mental health counseling was recommended for the Defendant but that she was not attending counseling. The trial court noted that defendants would sometimes comply with counseling "right before they have the sentencing hearings." The trial court concluded it was "not 100 percent sure she's amenable to correction," noting that she was resistant to taking her medication.

The trial court found that the circumstances of the offense were aggravated in that the Defendant was sending text messages about her drug use while driving over 65 miles per hour and not wearing a seatbelt. The trial court also noted that the Defendant crossed over a "huge median wider than the three lane traffic on either side" and broke through the cable barrier without ever applying the brakes. The trial court found that it was "disturbing" that the Defendant did not "have some kind of conscience to where she would at least pull over, because she might be a danger."

The trial court found that the Defendant had no criminal record at all, which weighed in favor of diversion. Regarding the Defendant's social history, the trial court found that it was "good and bad," noting that she had a history of drug abuse and mental health problems but also noting that she had a difficult childhood and that she was only seventeen at the time of the accident. Regarding the Defendant's mental health, the trial court expressed concern that the Defendant was not addressing her mental health problems or was only temporarily complying with treatment for the purposes of sentencing.

On the issue of deterrence, the trial court found that "when this happened, it was all over the media." The judge noted that "[t]he first four or five times this was set, I got calls from the news media." The trial court noted that "people are concerned that you'd have a 17-year-old on dope killing a person and injuring so many people." The trial court noted that there would be deterrence value in punishment "because this will most likely be reported, and we're having a huge problem, not just in Memphis but in the United States with texting and driving without drugs."

In evaluating the best interest of the public and the accused, the trial court found that diversion would be in the best interest of the Defendant because public knowledge of

the offense could affect her future employment prospects. The trial court found that the interests of the public would best be served by having the offenses on her record because "the public has a great interest in making sure that we don't have folks working with kids without letting their issues be known to the people over them."

The trial court denied diversion. It also found a sustained intent to violate the law because the Defendant had been using drugs the night before and then drove in the morning. The trial court noted that "she was texting people about how she was wasted."

The trial court found that the Defendant was a Range I offender. The trial court repeatedly referred to the Defendant's crime as "reckless vehicular homicide." It noted that she was "not pleading guilty to homicide by intoxication" but that she acted recklessly in "allowing herself to drive impaired in this manner, and not caring, and the texting." The trial court found as an enhancement factor that her drug use constituted prior criminal behavior and as a mitigating factor that she had had a difficult childhood.

The trial court sentenced the Defendant to concurrent sentences of two years for the homicide, one year for each reckless endangerment conviction, and six months for the marijuana conviction. The trial court noted it did not want to depreciate the seriousness of the offenses and expressed concern that the Defendant was "resistant" to treatment and accepting responsibility based on the presentence report. The trial court ordered the Defendant to serve thirty days in prison and then be placed on probation for a period of six years. *See* T.C.A. § 40-35-303(c), Sentencing Comm'n Cmt. The Defendant was ordered to undergo drug screenings, counseling, and be compliant with her medication as part of her probation. The trial court noted that it would "have to by law revoke her license for three years to drive under the statute." While the court acknowledged it might be difficult for the Defendant to attend school and work, it noted that the revocation was mandatory under statute.

## ANALYSIS

The Defendant asserts that the trial court erroneously sentenced her under the incorrect statute and challenges the trial court's denial of judicial diversion. The State responds that any error in sentencing was clerical in nature or waived and that the trial court did not abuse its discretion in denying diversion.

### I. Erroneous Sentencing

According to the Defendant, the record indicates that the trial court imposed its sentence not for the offense to which she pled guilty, reckless homicide, but for reckless

vehicular homicide. She also argues that the trial court erred in revoking her license for a period of three years. The State, narrowly interpreting the issue as related only to the revocation of the Defendant's license, responds that the issue is waived, that the Defendant has not established plain error, that this court should remand for correction of a clerical error only, and that the trial court had the authority to revoke the Defendant's license.[2] The Defendant disputes that the issue is waived.

The vehicular homicide statute provides, as pertinent to this case:

> (a) Vehicular homicide is the reckless killing of another by the operation of an automobile, airplane, motorboat or other motor vehicle, as the proximate result of:

> (1) Conduct creating a substantial risk of death or serious bodily injury to a person; [or]

> (2) The driver's intoxication, as set forth in § 55-10-401. For the purposes of this section, "intoxication" includes alcohol intoxication as defined by § 55-10-411(a), drug intoxication, or both;

T.C.A. § 39-13-213(a) (2015). Vehicular homicide as a result of recklessness is a Class C felony, whereas vehicular homicide by intoxication is a Class B felony. T.C.A. § 39-13-213(b)(1), (b)(2)(A). "The court shall prohibit a defendant convicted of vehicular homicide from driving a vehicle in this state for a period of time not less than three (3) years nor more than ten (10) years." T.C.A. § 39-13-213(c). Reckless homicide, on the other hand, is "a reckless killing of another." T.C.A. § 39-13-215(a). Reckless homicide is a Class D felony. T.C.A. § 39-13-215(b).

We begin by observing that the trial court regularly and throughout the hearing referred to the offense in question as "reckless vehicular homicide." While the prosecutor stated at the beginning of the hearing that the Defendant would be pleading guilty to reckless homicide rather than vehicular homicide, the trial court on four occasions referred to the offense as reckless vehicular homicide. On only one occasion, the trial court used the phrase "reckless homicide" in describing the crime, while referring to how the circumstances of the crime were aggravated. On one other occasion, when the trial court mentioned "reckless homicide," it quickly "corrected" itself: "If you were convicted of reckless homicide -- I mean, excuse me, of vehicular homicide -- just a second. I -- as -- as a reckless vehicular homicide...." When analyzing potential enhancement, the trial court noted that the severity of the injuries was already accounted

---

[2] We are unable to view certain pages of the State's brief due to an error in the electronic file.

for in the offense of "reckless vehicular homicide." In imposing the sentence, the court summarized that the Defendant was entering a "plea of guilty to reckless vehicular homicide."

We note likewise that, when the trial court was summarizing the potential punishment the Defendant faced, it informed her that "reckless vehicular homicide" was punishable by three to fifteen years in prison, which is indeed the range of punishment available for reckless vehicular homicide, a Class C felony. *See* T.C.A. § 40-35-111(b)(3); T.C.A. § 39-13-213(b)(1). The trial court did not inform the Defendant of the range of punishment for reckless homicide, a Class D felony, although the judgment form reflects a sentence of two years for that offense. In contrast, when the trial court summarized the potential punishments for the reckless aggravated assault charges that had been amended to reckless endangerment with a deadly weapon, it noted to the Defendant that the charges were being amended, that she was agreeing to the amendment of the charges, and that the new charges were a lower class of felony, carrying a potential sentence of one to six years rather than two to twelve years. *See* T.C.A. §§ 40-35-111(b)(4), (b)(5); 39-13-103(a)(2); 39-13-102(a)(1)(B)(iii), (e)(1)(A)(v) (2015).

The judgment form, reflecting that the Defendant was sentenced to two years for a Class D felony, has a typewritten entry which originally showed the indicted offense as "reckless homicide" and the conviction offense as "reckless homicide." However, the word "homicide" is crossed out in both entries and replaced with the handwritten phrase "vehicular homicide," making the offenses "reckless vehicular homicide." The judgment form does not reflect the amendment to the indictment. The other counts which were amended contain handwritten corrections to show that the indicted offense was reckless aggravated assault and that the amended and conviction offenses were reckless endangerment.[3]

As further proof that the trial court was mistaken regarding the nature of the offense, the court noted at the end of the plea/sentencing hearing that the revocation of the Defendant's license was mandatory for the statutory period of three years, expressing reservations about the requirement due to the fact that the Defendant would have difficulty with transportation for school and work.

In sum, the record reflects that the error here was anything but clerical in nature. Instead, the trial court was laboring under a fundamental misapprehension about the

---

[3] We note that Count 5, originally charged as reckless endangerment with a deadly weapon, was erroneously "corrected" with a handwritten note to show the indicted offense as aggravated assault and amended offense as reckless endangerment with a deadly weapon. The conviction offense is correctly stated as reckless endangerment with a deadly weapon. On resentencing, this error is to be corrected.

nature of the offense, reflected in its numerous references to "reckless vehicular homicide," its omission in informing the Defendant of the range of punishment she faced under the amended indictment, its statement that the Defendant was entering a guilty plea to reckless vehicular homicide, the erroneous completion of the judgment form, and the trial court's statement that revocation of the Defendant's license for three years was mandatory. While the State may be correct that the trial court was obligated to require the surrender of the Defendant's license and to forward the conviction to the department of safety for further action,[4] the trial court's ruling that the Defendant's license was revoked for three years was obviously predicated on its erroneous belief that she was pleading guilty to reckless vehicular homicide and that revocation for a minimum of three years was required by law.

Despite the trial court's repeated references to "reckless vehicular homicide," neither trial counsel nor the prosecution clarified the nature of the plea at the hearing. The State asserts that the issue is waived, whereas appellate counsel argues that no timely objection could have been made because the nature of the error was not clear until the trial court announced its ruling. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

We conclude that, even if we were to determine that the issue was waived, the error was nevertheless so serious that it would constitute plain error meriting relief. For an error to constitute plain error, the following factors must be present:

> (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice.

*State v. Bishop*, 431 S.W.3d 22, 44 (Tenn. 2014) (citing *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). Additionally, "'the plain error must be of such a great magnitude that it probably changed the outcome'" of the proceeding. *Id.* (quoting

---

[4] The State notes that under Tennessee Code Annotated section 55-50-501, the department of safety "shall forthwith revoke the license" of an operator of a motor vehicle who has been convicted of "[a]ny felony in the commission of which a motor vehicle is used" "upon receiving a record of the operator's … conviction …, when the conviction has become final." T.C.A. § 55-50-501(a), (a)(3). Furthermore, when revocation is mandatory, the court of conviction "shall require the surrender" of the offender's license, "and the court shall thereupon forward the licenses together with a record of the conviction to the department." T.C.A. § 55-50-503(a).

- 10 -

*Adkisson,* 899 S.W.2d at 642). This court need not consider all the factors if it is clear that the defendant will fail to establish at least one. *State v. Jordan,* 325 S.W.3d 1, 58 (Tenn. 2010). Plain error "would have to especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding." *State v. Page,* 184 S.W.3d 223, 231 (Tenn. 2006).

We conclude here that the record clearly establishes that the trial court was, at a minimum, confused about the nature of the offense to which the Defendant was pleading guilty. Despite the State's haphazard contentions otherwise, sentencing the Defendant for an offense to which she did not plead guilty breaches a clear and unequivocal rule of law and adversely affects her substantial rights. In particular given the trial court's reservations regarding the mandatory revocation of the Defendant's driver's license for a period of three years, we conclude that consideration of the error is necessary to do substantial justice and that it probably changed the outcome of the proceeding. Here, the nature of the right affected was "so fundamental as to reflect upon 'the fairness, integrity or public reputation of judicial proceedings.'" *State v. Bledsoe,* 226 S.W.3d 349, 354 (Tenn. 2007) (quoting *United States v. Olano,* 507 U.S. 725, 736 (1993)). There is no indication that the issue was waived for tactical reasons.

Having determined that the trial court erred in sentencing, we remand the case for resentencing.[5]

## II. Judicial Diversion

The Defendant insists that the trial court abused its discretion in denying her diversion. The Defendant acknowledges that the trial court considered the proper factors in assessing diversion but asserts that the trial court relied on an erroneous assessment of the evidence, that the trial court impermissibly considered facts outside the record, and that the trial court erred in weighing the factors. The State responds that the trial court properly denied diversion after considering and weighing the relevant factors.

Judicial diversion is a "legislative largess" granted to certain qualified defendants whereby the judgment of guilt is deferred and the defendant is placed on probation. *State v. King,* 432 S.W.3d 316, 323 (Tenn. 2014); *see* T.C.A. § 40-35-313(a)(1)(A). If the

---

[5] We note parenthetically that the Defendant's contention that the trial court could not sentence her to six years of probation for a Class D felony as a Range I offender is incorrect. The Sentencing Commission Comments in fact use this exact scenario to illustrate the fact that probation may be imposed "up to and including the statutory maximum time for the class of the conviction offense," T.C.A. § 40-35-303(c), explaining that a Range I offender convicted of a Class D felony could receive a sentence of two years "which could be suspended for a period of time up to 12 years, because the statutory maximum for a Class D felony is 12 years," T.C.A. § 40-35-303(c), Sentencing Comm'n Cmt.

defendant is successful in completing the probation assigned as part of diversion, the charges will be dismissed and the defendant may seek expungement. T.C.A. § 40-35-313(a)(2), (b). Upon successful completion, the defendant will be restored "'to the status the person occupied before such arrest or indictment or information.'" *State v. Dycus*, 456 S.W.3d 918, 925 (Tenn. 2015) (quoting T.C.A. § 40-35-313(b)). Violation of the probation imposed as a condition of diversion may result in an adjudication of guilt and imposition of a sentence. *Id.*; T.C.A. § 40-35-313(a)(2). The statute defines which defendants are qualified to apply for diversion, and the parties here do not dispute that the Defendant was a qualified to be considered for diversion. *See* T.C.A. § 40-35-313 (a)(1)(B)(i). However, "[t]here is no presumption that a defendant is a favorable candidate for judicial diversion." *Dycus*, 456 S.W.3d at 929.

Like other sentencing decisions, the decision to grant or deny diversion is reviewed for an abuse of discretion. *King*, 432 S.W.3d at 324-25. "Reviewing courts will find an abuse of discretion only when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008). Although the deferential standard of review articulated in *Bise* applies to the decision to grant or deny diversion, the common law factors which the trial court has long been required to consider in its decision have not been abrogated. *King*, 432 S.W.3d at 326. Accordingly, in determining whether judicial diversion is appropriate, a trial court must consider:

> (a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, and (f) the deterrence value to the accused as well as others. The trial court should also consider whether judicial diversion will serve the ends of justice—the interests of the public as well as the accused.

*State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996) (footnote omitted). In addition to considering these factors, the trial court must weigh them against one another and place an explanation of its ruling on the record. *King*, 432 S.W.3d at 326 (citing *State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998)).

If the trial court has adhered to these requirements, the reviewing court merely looks to see whether "any substantial evidence" exists in the record to support the trial court's decision. *Id.* "Under the *Bise* standard of review, when the trial court considers the *Parker* and *Electroplating* factors, specifically identifies the relevant factors, and places on the record its reasons for granting or denying judicial diversion," this court must apply a presumption of reasonableness and uphold the trial court's decision so long

- 12 -

as there is any substantial evidence to support the decision. *Id.* at 327. The trial court need not "recite" all of the factors, but the record must reflect that it considered each factor, identified the specific factors applicable to the case, and addressed the relevant factors. *Id.* "'[A] trial court should not deny judicial diversion without explaining both the specific reasons supporting the denial and why those factors applicable to the denial of diversion outweigh other factors for consideration.'" *State v. Walter Townsend*, No. W2015-02415-CCA-R3-CD, 2017 WL 1380002, at *2 (Tenn. Crim. App. Apr. 13, 2017) (quoting *State v. Cutshaw*, 967 S.W.2d 332, 344 (Tenn. Crim. App. 1997)).

When the trial court has neglected to consider and weigh the factors, its decision may either be reviewed de novo or remanded for reconsideration. *King*, 432 S.W.3d at 327-28. The determination of whether to conduct a de novo review or to remand to the trial court lies within the discretion of the appellate court. *Dycus*, 456 S.W.3d at 930.

As we have noted above, it appears that the trial court was laboring under the impression that the Defendant was pleading guilty to reckless vehicular homicide rather than reckless homicide. Accordingly, when the trial court denied diversion, it did so thinking that it was denying diversion for the crime of reckless vehicular homicide as well as the other offenses to which the Defendant pled guilty. We conclude that the misapprehension regarding the nature of the crime to which the Defendant was pleading guilty had a pervasive effect on the entirety of the trial court's sentencing decisions. The trial court was confused about the statutory offense to which the Defendant was pleading guilty, and we cannot but conclude that this mistake "tainted the court's decision-making process such that the presumption of reasonableness standard is not appropriate." *State v. Chyanne Elizabeth Gobble*, No. E2014-01596-CCA-R3-CD, 2015 WL 12978645, at *9 (Tenn. Crim. App. Aug. 12, 2015). In any case, a court "by definition abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100 (1996); *see State v. Iris A. Jones*, No. M2013-00938-CCA-R3-CD, 2014 WL 4101210, at *7 (Tenn. Crim. App. Aug. 20, 2014) (concluding that an error of law in determining whether the defendant was qualified for diversion was an abuse of discretion). We conclude that the trial court's erroneous application of the reckless vehicular homicide statute to the Defendant's guilty plea to reckless homicide requires us to remand the case for a new determination regarding whether the Defendant should be granted judicial diversion. *See State v. Brys Andrew Hensley*, No. E2012-00812-CCA-R3-CD, 2013 WL 793579, at *5 (Tenn. Crim. App. Mar. 4, 2013) (concluding that the trial court's mistaken belief that it was required to revoke the defendant's diversion when he violated a condition of his probation was reversible error).

We further note that although the trial court meticulously addressed each of the *Parker* factors in turn, it did not indicate what weight it assigned to any particular factor or why the factors weighing against diversion outweighed the factors weighing in favor

- 13 -

of diversion. The trial court made a lengthy finding that the Defendant was not amenable to correction because the presentence report indicated she was not compliant with her medication or counseling and had not been entirely honest during the presentence interview. It also concluded that the circumstances of the offense were aggravated, inferring that intoxication played a role in the accident based on the Defendant's texts about intoxication, the presence of intoxicants in her bloodstream, and her failure to apply the brakes during the five seconds that she travelled across the wide median and broke through the cable barrier. The trial court found the Defendant's lack of criminal history weighed in favor of diversion. Her social history was neutral, as her mental illness and difficult childhood reduced her culpability while her history of drug use and unstable mental health raised concern. The trial court expressed concern that she was failing to treat her mental illness. It concluded that considerations of deterrence weighed against diversion, that the Defendant's interest weighed in favor of diversion, and that the public's interest weighed against diversion. However, the trial court did not indicate what weight it applied to any of the factors. When the trial court has not weighed the factors on the record, the appellate court may remand or conduct a de novo review. *King*, 432 S.W.3d at 328. While the record here is certainly adequate to allow for a de novo review, our conclusion that the trial court was mistaken regarding the nature of the offense to which the Defendant was entering a plea in any case requires a remand for a new determination regarding diversion.

Because we have concluded that the error regarding the nature of the homicide offense requires the trial court to reconsider its decision regarding the denial of judicial diversion, we vacate all of the judgments and remand for further proceedings. *See id.* at 324 (recognizing that "the conditional probationary period incident to the grant of judicial diversion does not qualify as a sentence per se" but is instead a decision to either defer or impose a judgment).

## CONCLUSION

The record reveals that the State and the Defendant had a full and complete evidentiary hearing. The problem here is with the trial court's mistaken belief that it was sentencing the Defendant under a statute to which she did not plead guilty. On remand, it is left with the sound discretion of the trial court as to any further evidence concerning sentencing that needs to be received.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE

- 14 -